NORTEK, INC., Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
CO., Defendant.

Civ. A. No. 92–0064–T.

United States District Court,
D. Rhode Island.

Feb. 2, 1994.

**1232**

Paul V. Curcio, Joseph Avanzato, Providence, RI, for plaintiff.

James P. Marusak, Providence, RI, for defendant.

## ORDER

TORRES, District Judge.

After hearings in open Court held on January 28, and January 31, 1994, it is hereby ordered:

1. The Magistrate Judge's Report and Recommendation dated November 16, 1993 is accepted. Nortek's Motion for Partial Summary Judgment is granted except on the

issue of damages, and Liberty's cross-motion for summary judgment is denied.

2. The Magistrate Judge's Order dated January 10, 1994 is affirmed.

3. The Defendant's motion to amend answer is denied.

4. The Plaintiff's motion in limine is denied.

## REPORT AND RECOMMENDATION

BOUDEWYNS, United States Magistrate Judge.

Plaintiff Nortek, Inc. ("Nortek") has moved, pursuant to Federal Rule of Civil Procedure ("FRCP") 56, for partial summary judgment against defendant Liberty Mutual Insurance Company ("Liberty Mutual") on Count I of its complaint alleging breach of contract. Liberty Mutual has objected and filed its own cross-motion for summary judgment. As discussed below, I find there are no genuine issues of material fact in this case except for the issue of damages. I further find that Nortek is entitled to judgment as a matter of law on its breach of contract claim. Accordingly, I recommend that Nortek's motion for partial summary be granted except on the issue of damages, and that Liberty Mutual's cross-motion for summary judgment be denied.[1]

*Facts*

This dispute arises out of Liberty Mutual's refusal to defend its insured, Nortek, when Nortek was sued by Harden Industries Inc. ("Harden") for, *inter alia*, breach of a confidentiality agreement and trademark infringement. Nortek was insured by a general liability insurance policy ("the Policy") which required Liberty Mutual to defend Nortek in any suit seeking "advertising injury" damages against Nortek.

On March 23, 1989, Harden filed in the United States District Court for the Central District of California a nine-count complaint against Nortek and certain of its related entities for injunctive relief, compensatory damages, treble damages and punitive damages. Harden filed a first amended complaint ("Harden Complaint") on May 17, 1989. The complaint included a request for a temporary restraining order and preliminary injunction enjoining, *inter alia*, the marketing and sale of any products bearing Harden's claimed trademark. Nortek immediately hired its own lawyers to defend against the action. Almost one year after the original filing, on February 9, 1990, Nortek submitted a copy of the Harden Complaint to Liberty Mutual and notified Liberty Mutual of its claims under the Policy for defense in the Harden Litigation and indemnification.

Six months after being notified of Nortek's claims, on August 9, 1990, Liberty Mutual responded to Nortek's request by denying both coverage and a duty to defend. In its letter of denial, dated August 9, 1990, Liberty Mutual claimed, *inter alia*, that:

> The gist of the complaint is misappropriation of a product line. Aside from the fact that this offense is not designated in the advertising injury definition, we do not feel it was committed in the course of advertising Nortek's products. It is our opinion that the trademark allegations in the first claims do not trigger a duty to defend.

> . . . .

> In conclusion, we respectfully disclaim coverage in that we do not feel that the complaint alleges any covered damages. Therefore, there is no duty to defend.

Liberty Mutual changed its position approximately three months later. Purportedly on the basis of the deposition testimony of Mr. George Strong,[2] Harden's expert witness

---

1. Nortek has also moved, pursuant to FRCP 54(b) for an order to enter final judgment against Liberty Mutual on Count I in the amount of $2,410,164.96. Because I find that there exists a genuine issue of material fact as to the amount of damages in this action, I recommend that this motion be denied.

2. Liberty Mutual pointed to Mr. Strong's allegation that "Nortek approached the company that manufactures boxes for Harden and asked for similar or identical boxes." It reasoned, "a distinctive package could be considered to be a form of advertising." Liberty Mutual further reasoned that, "Strong's deposition thus raises the possibility that by using similar boxes Nortek was imitating Harden's 'style of doing business' as that term is used in our coverage."

Counsel for Liberty Mutual argued at the hearing on this matter that this acknowledgement of

**1234**

on accounting and financial matters, Liberty Mutual informed Nortek on November 14, 1990 that: Liberty Mutual would "cover damages awarded on the theory that Nortek's advertising materials constituted misappropriation of Harden's advertising materials"; Liberty Mutual "owe[s] a defense to Nortek" in the Harden Litigation; and Liberty Mutual would provide a defense to Nortek retroactive to October 15, 1990, the date that Nortek submitted Mr. Strong's testimony to Liberty Mutual. As set forth in Liberty Mutual's letter of November 14, 1990, however, this "defense" was made subject to restrictions unilaterally imposed by Liberty Mutual, including a cap of $105 per hour for attorneys' fees for which Liberty Mutual would reimburse Nortek.[3]

Nortek continued to defend itself in the Harden Litigation, incurring attorneys fees and costs without regard to Liberty Mutual's "restrictions."[4] The California suit ended with a settlement agreement, by which Liberty Mutual agreed to pay Harden $2 million dollars. Liberty Mutual reimbursed Nortek $414,191.61 for its litigation expenses.

In this action, Nortek seeks to collect the additional unpaid fees and costs, which amount to $2,410,164.96. Nortek argues that, because the factual allegations in the Harden Complaint raise the reasonable *possibility* of coverage under the Policy, Liberty Mutual was required by the terms of the Policy and applicable law to defend against *all* of the claims. In its defense, Liberty Mutual argues that not only is there no duty

to pay the *additional litigation costs*, but there never was any duty to pay *any* litigation costs because there was never any possibility of coverage under the Policy. As discussed below, I find that there was a "possibility" of coverage under the Policy, and Liberty Mutual did have an obligation to defend.

*Discussion*

 Defendant's motion for summary judgment is made pursuant to FRCP 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The initial burden in a summary judgment motion requires the moving party to show that no genuine issue exists as to any material fact.[5] The burden then shifts to the non-moving party to show that there is least one factual issue that is both "genuine" and "material." The factual issue is "genuine" if there is sufficient evidence favoring the non-moving party on which a jury could reasonably return a verdict for that party.[6] If the evidence is based on conjecture, merely colorable, or is not significantly probative of the fact alleged in the complaint, there is no "genuine" issue, and summary judgment may

---

a limited defense obligation was based on Liberty Mutual's interpretation of California law, not Rhode Island law. California law differs from Rhode Island law on the "duty to defend," counsel suggested, because materials outside of the complaint made known to the insurer may trigger the duty to defend.

**3.** As set forth in Liberty Mutual's letter of November 14, 1990, the "defense" was made subject to restrictions unilaterally imposed by Liberty Mutual and not found in the Policy. The restrictions included a "cap" of $105 per hour for attorneys fees, $55 per hour for paralegal time, no reimbursement for secretarial overtime, no reimbursement for "meals or over night [sic] trial without pre-approval," and no reimbursement for any costs, expenses or attorneys' fees that were incurred before October 15, 1990. Liberty Mutual later refused to allow reimburse-

ment for any of the legal services that Adler Pollock & Sheehan Inc., provided Nortek in the Harden Litigation.

**4.** It claims to have incurred a total of $2,824,356.57 in attorneys fees and costs.

**5.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

**6.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In a summary judgment motion, the Court will not resolve questions of credibility or conflicting inferences. Rather, it will assess the sufficiency of evidence as a matter of law, resolving all factual disputes in favor of the opponent. *Id.*

be granted.[7] The issue of fact is "material" if the dispute necessarily "affect[s] the outcome of the suit."[8] The court's function is to determine whether or not such a genuine issue exists, and not to resolve such existing factual issues.[9]

█ If the Court determines that no genuine issue of material fact exists, the Court must then determine whether the movant is entitled to judgment as a matter of law. In making this determination, the Court considers the facts from the record, and makes inferences therefrom in the light most favorable to the nonmoving party.[10]

### 1. Choice of Law

█ Neither party has submitted a compelling choice-of-law analysis. Although Nortek argues that "the laws of California and Rhode Island are the same with respect to this motion," this Court clearly has an obligation to apply one State's law or the other on each issue presented. Moreover, Liberty Mutual does not agree that the law is the same on every issue, and it contends that the differences in law do make a difference to the outcome of this motion.[11]

In an action such as this based on diversity of citizenship under 28 U.S.C. § 1332, the federal district court must apply the law of the forum in which it sits,[12] including the forum's choice-of-law rules.[13] Under Rhode Island's general choice-of-law principles,[14] the Court must analyze which forum's law holds the most appropriate relationship to the "underlying transaction." The central facts pertinent to a choice-of-law analysis in this case are, (1) the provisions of an insurance contract between an Rhode Island Corporation and Boston-based Insurer which establishes a "duty to defend" on the part of the insurer, and (2) a law suit brought by a California corporation against the insured in a California court.

Rhode Island law is clearly the most appropriate for determining the insurer's "duty to defend" because of Rhode Island's interest in establishing uniform rules governing the rights of insurance policy holders within this state, and the duties of foreign insurance companies who do business with residents of this state. Other choice-of-law questions, such as the extent and rate of payment to be paid by an insurer for the service of lawyers providing a defense to an action in California

---

7. Id.; First. Nat. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); Local No. 48, United Brotherhood of Carpenters and Joiners v. United Brotherhood of Carpenters and Joiners, 920 F.2d 1047, 1050 (1st Cir.1990).

8. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

9. Id. at 249, 106 S.Ct. at 2511.

10. Anderson, 477 U.S. at 248, 255, 106 S.Ct. at 2510, 2513. See Blanchard v. Peerless Ins. Co., 958 F.2d 483, 485 (1st Cir.1992); Continental Casualty Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir.1991).

11. At the hearing on this matter, Counsel for Liberty Mutual agreed that Rhode Island law applies to the question of duty to defend as a general matter. However, he argued that there are specific questions within the "duty to defend" issue that necessitate application of California law.

12. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Walker v. Armco Steel Corp., 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980).

13. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

14. The Rhode Island Supreme Court has endorsed the application of the Second Restatement's general choice-of-law principles. See Gordon v. Clifford Metal Sales Co., 602 A.2d 535, 538–39 (R.I.1992). In this analysis, the Court is to weigh the following factors "with an eye for determining which forum bears the most appropriate relation to the transaction":

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

"(d) the protection of justified expectations,

"(e) the basic policies underlying the particular field of law,

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to be applied."
Restatement (Second) Conflict of Laws § 6.

by California lawyers, need not be considered at this time.[15]

### 2. Duty to Defend

Analysis of this case begins with the clear provisions of the Policy. Under the "Designated Advertising Offenses Coverage Endorsement" in the Policy, Liberty Mutual has the "right and duty" to defend any suit seeking "sums that the insured person becomes legally obligated to pay as damages because of 'advertising injury.'"

▆▆▆ Under Rhode Island Law, an insurer's "duty to defend" is broader than its duty to indemnify.[16] A duty to defend arises if only one of the factual allegations in the complaint raises the reasonable *possibility* of coverage under the policy.[17] The insurer cannot rely on facts not asserted in the complaint to avoid its duty to defend.[18] Further, if any *one* of the acts alleged in the Harden Complaint could possibly be covered under the Policy, then Liberty Mutual had "an unequivocal duty to defend" Nortek against *all* of the claims.[19] The Court may therefore determine whether a "duty to defend" arises by comparing the factual allegations in the Harden Complaint side-by-side with the Policy.[20]

### a. Harden Complaint

▆▆▆ The Harden Complaint contains the following factual allegations concerning Nortek's conduct, *inter alios:*

(1) "circulating advertising materials in a catalogue" that contained photographs of Harden's products;

(2) "marketing and advertising the Harden product" as Nortek's product;

(3) "market[ing] of products that bore Harden's trademark";

(4) "misappropriati[on]" of Harden's product line for use in Nortek's marketing and advertising;

(5) "misappropriati[on] ... [of] photographs of Harden's products to be used in [Nortek's] catalog,"

(6) "misappropriat[ion] [of] Harden's trade secrets" to solicit Harden's sales representatives for the marketing of Nortek's products and to "solicit Harden's preferred customers,"

(7) "misappropriation" of Harden's "display racks and display products,"

(8) packaging of infringing products in boxes bearing "Harden's unique model designation numbering information,"

(9) "misappropriati[on]" of Harden's "customer lists,"

(10) "misappropriati[on] ... [of] the Harden network of sales representatives,"

(11) informing potential customers that "Harden was 'going out of business,' or 'into bankruptcy,'" to induce them to purchase Nortek's products, and

(12) "disparag[ing] [the] business reputation" of Harden's President and Chief Ex-

---

**15.** These questions need not be considered at this time because, as suggested below, summary judgment should be denied on this issue.

**16.** *Mellow v. Medical Malpractice Joint Underwriting Ass'n*, 567 A.2d 367, 368 (R.I.1989); *Employers' Fire Ins. Co. v. Beals*, 103 R.I. 623, 633, 240 A.2d 397, 403 (1968).

**17.** *Mellow*, 567 A.2d at 368; *Hingham Mut. Fire Ins. Co. v. Heroux*, 549 A.2d 265, 266 (R.I.1988); *Flori v. Allstate Ins. Co.*, 120 R.I. 511, 513, 388 A.2d 25, 26 (1978); *Beals*, 103 R.I. at 632, 240 A.2d at 402. *See also Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945, 949 (4th Cir.1988).

**18.** *Flori*, 120 R.I. at 513–14, 388 A.2d at 26; *Beals* 103 R.I. at 631–32, 240 A.2d at 402.

**19.** "If some of the claims against the insured fall within the terms of coverage, and some without,

the insured must still defend the entire claim (at least until it is apparent that no recovery under the covered theory can be had) but need only indemnify for liability actually covered." *Titan Holdings Syndicate, Inc., v. Keene*, 898 F.2d 265, 269 (1st Cir.1990) (applying New Hampshire law and citing majority rule as discussed in *Western Cas. & Sur. v. Intern. Spas of Ariz.*, 130 Ariz. 76, 79–80, 634 P.2d 3, 6–7 (App.1981)). Although my research found no Rhode Island Supreme Court case which specifically adopts what the First Circuit and the Arizona court recognize as the "apparent majority rule," I think this rule is consistent with Rhode Island law, *cf. Beals*, 103 R.I. at 632–33, 240 A.2d at 402–03, and I think Rhode Island Supreme Court would apply it if faced with a similar case.

**20.** *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 239 (4th Cir.1990). *See Flori*, 120 R.I. at 513, 388 A.2d at 26.

ecutive Officer in the course of soliciting business from Harden's suppliers and sales representatives.

### b. *Terms of the Policy*

In the Policy, Liberty Mutual has the "right and duty" to defend any suit seeking "sums that the insured person becomes legally obligated to pay as damages because of "advertising injury." "Advertising injury" means "injury arising out of advertising [or] publishing ... done by or for [the insured] and resulting from one or more 'designated advertising offenses.'" "'Designated advertising offenses' includes:

(1) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

(2) Oral or written publication of material that violates a person's right of privacy;

(3) Misappropriation of advertising ideas or style of doing business; or

(4) Infringement of copyright, title or slogan;

in the course of advertising [the insured's] goods, products or services."

The Policy also provides that the "advertising injury" must be cause by an "occurrence." "Occurrence" is defined generally in the Policy to mean, "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Occurrence" is also defined specifically in the Advertising Endorsement section as the "commission of one or a related series of 'designated advertising offenses' during the policy period." Finally, the Policy expressly excludes coverage for, *inter alia*, "oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;" and "willful violation of a penal statute or ordinance committed by or with the consent of the insured."

### c. *Analysis*

Comparing the express terms of the Policy with the allegations in the complaint, there is no doubt that Liberty Mutual has a duty to defend. According to Rhode Island law, Liberty Mutual has a duty to defend where the allegations in the complaint raise the *possibility* of coverage for any one of the designated advertising offenses.[21] Although there are many allegations that could possibly be covered as designated advertising offenses, it is sufficient to highlight just two.

Allegation number one, relating to "circulating advertising materials in a catalogue" that contained photographs of Harden's products, could "possibly" be covered under designated offense number one "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," or it could "possibly" be covered under designated offense number three, "misappropriation of advertising ideas or style of doing business," or designated offense number four, "infringement of copyright, title or slogan."

Similarly, allegation number eight, packaging in boxes bearing "Harden's unique model designation numbering information," could "possibly" be covered by designated offense number three, "misappropriation of advertising ideas or style of doing business," or designated offense number four, "infringement of copyright, title or slogan." In its letter of November 14, 1990, Liberty Mutual admitted possible coverage on this allegation:

The "misappropriation of ideas or style" offense included in the Designated Advertising Offenses Coverage was intended to cover a form of unfair competition in which a company attempts to imitate a competitors advertising materials. In our opinion, a distinctive package could be considered to be a form of advertising.[22]

Liberty Mutual also stated that it would "cover damages awarded on the theory that Nortek's advertising materials constituted misappropriation of Harden's advertising materials." [23]

**21.** *Beals,* 103 R.I. at 632, 240 A.2d at 402. *See Liberty Life,* 857 F.2d at 949.

**22.** Plaintiff's Exhibit K.

**23.** *Id.* In this same letter, Liberty Mutual explains that it was able to arrive at this conclusion only after reading the deposition testimony of George Strong (Harden's expert witness on financial and accounting matters) which alleged

It is also clear that these factual allegations, if proven to be true, could be considered "in the course of advertising" which the Policy requires. Just the words alone—"circulating, advertising materials," "market[ing], bathroom faucets and fixtures bearing Harden's trademark...." would seem to qualify. Moreover, referring again to Liberty Mutual's November 14, 1990, the letter states "In our opinion a distinctive package could be considered a form of advertising." [24]

Liberty Mutual has admitted that there was a duty to defend in this case on other occasions. Michael K. Grubbs, the claims examiner at Liberty Mutual who reviewed Nortek's claims for indemnification and defense, and one of Nortek's primary contacts with its insurance carrier on coverage issues, testified at his deposition that the referenced allegations in the Harden Complaint could constitute "[m]isappropriation of advertising ideas or style of doing business." [25] He also testified that language in the Harden Complaint alleged that Nortek's activities occurred "in the course of advertising." [26]

In reviewing plaintiff's summary judgment motion, the only relevant "material facts" are the factual allegations of the Harden Complaint and the Policy. [27] The language of the Harden Complaint is uncontroverted. Rhode Island law on a "duty to defend" is clear. Based on the above analysis, Liberty Mutual had an unequivocal duty to defend Nortek in the Harden litigation.

### d. *Liberty Mutual's Admissions*

As discussed above, Nortek has pointed to instances where Liberty Mutual has admitted a duty to defend Nortek in the Harden litigation. [28] In its defense, Liberty Mutual argues that "defendant contested both the coverage and the defense obligation and Nortek actually acknowledged and consented to such a reservation in writing." Looking closely at Liberty Mutual's argument as to "reservation of rights," it would seem that it abandoned any "reservation" to contest its *limited* duty to defend. [29] In any case, it is irrelevant whether Liberty Mutual reserved its rights to contest this issue, because, as demonstrated above, Liberty Mutual *did* have an obligation to defend.

### e. *Breach*

While Liberty Mutual did have an obligation to defend, the undisputed facts demonstrate that it failed to reasonably provide a defense to Nortek. Liberty Mutual initially refused to provide any defense at all. Three months after this initial position and nine months after receiving notice of the claims, Liberty Mutual finally acknowledged a limited duty to defend and reimbursed Nortek for only some of its attorneys fees and costs. Liberty Mutual is in breach because, *inter*

---

that "Nortek approached the company that manufactures boxes for Harden and asked for similar or identical boxes." The Harden Complaint clearly alleges, however, "the [Nortek] boxes bear Harden's unique model designation numbering information" and that Nortek "[misappropriated] Harden display racks and display products" and "[circulated] advertising materials in a catalog."

**24.** Plaintiff's Exhibit K.

**25.** Plaintiff's Exh. J at 113–15.

**26.** Plaintiff's Exh. J at 119–20.

**27.** *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 239 (4th Cir.1990). *See Flori*, 120 R.I. at 513, 388 A.2d at 26.

**28.** In addition to the instances referenced *supra* where Liberty Mutual has admitted a duty to defend, Nortek also characterizes as admissions: Liberty Mutual's payment of the two million dollars in settlement, statements of counsel before Magistrate Judge Hagopian, and Liberty Mutual's response to Nortek's interrogatory No. 2.

**29.** The "reservation of rights," Liberty Mutual argues, is found in letters dated April 1, 1991 and September 9, 1991, well after Liberty Mutual had already admitted to a limited defense obligation (purportedly based on an interpretation of California law) in its November 14, 1990 letter. Although in its letter of April 1, 1991, Nortek purportedly reserved its rights for reimbursement if Liberty Mutual was determined to have *"no defense obligation"* or "a more limited defense obligation," the September 9, 1991 letter only addresses only "the *additional* claimed defense obligations" requested by Nortek. *See* Defendants Exhibits HHHH and CCCC–1 (emphasis supplied). The September 9, 1991 letter came only four days after "[Counsel] communicated Liberty's willingness to increase the amount of the payment [to Harden] ... to [$2 million dollars]." It would seem that, at this time, Liberty Mutual was no longer holding to its position that it had no defense obligation at all.

*alia,* it did not reimburse Nortek for all of the reasonable fees and expenses Nortek incurred defending itself against all the claims in the Harden Complaint from the start of the litigation.[30]

### 3. *Occurrence*

■ Liberty Mutual argues that there was no possibility of coverage under the Policy because the complaint did not allege an "occurrence" as required by the express terms of the policy and as defined by well-established law. It argues that "[i]nsurance protects against an occurrence *not* a re-occurrence, particularly a deliberate one."[31] In other words, Liberty Mutual argues that there could be no coverage because the Harden Complaint alleged intentional offenses rather than accidental events, and intentional offenses are not covered under the Policy.

This issue is easily resolved by referring to the plain language of the Policy. The Policy, written by Liberty Mutual, defines "occurrence" *generally* to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." But the term is *specifically* extended in the "Designated Advertising Offenses Coverage Endorsement" to also include "commission of one or a related series of designated advertising offenses during the policy period." As discussed above, the Harden Complaint clearly raised factual allegations which could "possibly" be considered "advertising offenses." In sum, there is no doubt that the Harden Complaint alleges an "occurrence" as that term is defined by the Policy.

### 4. *Public Policy*

■ In a related argument, Liberty Mutual contends that, even if the factual allegations in the Harden Complaint did fit within the Policy's definition of "occurrence," there could be no "possibility" of coverage because, as a matter of public policy, courts do not allow indemnification for intentional torts.[32] Liberty Mutual argues that the whole concept of "insurance" involves risks, not certainties.[33] There is no "duty to defend," Liberty Mutual argues, because public policy would preclude any possibility of coverage under the Policy for Nortek's intentional acts.

The weakness of this argument is that Liberty Mutual was certainly aware of the public policy argument when it drafted coverage for designated intentional "advertising offenses." Although this Court may consider striking provisions as a matter of public policy where *coverage* under the policy is in question, the precise issue in this case is whether there is a *duty to defend;* the duty to defend arises from a "possibility" of coverage under the Policy. Since Liberty Mutual drafted, what it now claims are unlawful, the "intentional" provisions of the policy it should not now be heard to argue that it has no "duty to defend" against claims brought under those provisions.[34]

Thus, even if coverage for one of the "designated offenses" would constitute a violation of public policy, it is important to distinguish

---

**30.** Although Liberty Mutual might be in breach for failing to provide a complete defense, that does not mean that it is responsible for *additional* or *excessive* fees *incurred by Nortek as a result of Nortek's failure to provide timely and adequate notice.* As discussed in the "damages" section of this Report, *infra,* Liberty Mutual should be held liable only for those reasonable attorney's fees and costs which arise naturally from Liberty Mutual's breach itself or those that were "reasonably foreseeable" by the parties.

**31.** *Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27, 29 (1st Cir.1981).

**32.** Some courts have construed "occurrence" clauses to exclude from coverage injuries caused by intentional conduct of the insured, including

breach of contract, fraud and unfair trade practices. *Liberty Life Co. v. Commercial Union Ins. Co.,* 857 F.2d at 945, 949–50 (4th Cir.1988). Liberty Mutual also cites to California Civil Code § 1668, which provides:

> *Certain Contracts Unlawful.* All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, on willful injury to the person or property of another, or violation of the law, either willful or negligent, are against the policy of the law.

**33.** *Bartholomew,* 655 F.2d at 29 (1st Cir.1981).

**34.** This is made even more clear by Liberty Mutual's own November 14, 1990 admission that it "owe[s] a defense to Nortek."

between public policy as it relates to the *duty to indemnify* for intentional wrongs and public policy as it relates to the *duty to defend* against a complaint alleging intentional wrongs. The public policy behind prohibiting indemnification for intentional wrongs is clear—society does not wish to "encourage" people intending harm by allowing them to escape ultimate monetary liability. However, public policy does not counsel against an insurance company providing a defense against claims of intentional conduct especially where, as here, the insurance company itself drafted coverage for "intentional" torts in the Policy and there has been no determination yet of "intentional conduct"—only allegations. In sum, where the insurance company drafts provisions in a policy which cover intentional acts, the insurer must faithfully fulfill its "duty to defend" against claims concerning those types of acts.

A similar issue arose in a somewhat different context in *Liberty Life Insurance Company v. Commercial Union Insurance Company*,[35] The facts in *Liberty Life* are essentially the same as in the instant case. The subject policy specifically insured for injuries arising out of the insured's actions which included libel, slander, defamation or unfair competition in connection with advertising activities—all intentional torts. The objection to coverage in *Liberty Life* was that the intentional nature of the offenses conflicted with the requirement that there be an unexpected or unintended "occurrence." Although the Court did not discuss public policy concerns directly, it mentioned in *dicta* that "to allow [the insurer] to escape coverage at this stage of the proceeding under its definition of occurrence would make much or all of the advertising liability coverage illuso-

ry."[36] On this basis the court found "ambiguity [which] should be resolved in favor of the insured."

5. *Late Notice*

■■■ Liberty Mutual also argues that it has no duty to defend because Nortek failed to comply with material provisions of the contract relating to notice. The notice provisions in the contract provide:

2. Duties in the event of occurrence, claim or suit.

A. You must see to it that we are notified promptly of an occurrence which may result in a claim. Notice should include:

1. How, when and where the occurrence took place . . .

c. you and any other involved insured must:

1. Immediately send us copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

The policy further provides that "no person or organization has a right under this Coverage part; . . . unless all of its terms have been fully complied with."

■■■ In asserting its "late notice" defense, Liberty Mutual claims that this default constitutes a material breach of the Policy, and Liberty Mutual therefore has no duty to defend. As established by the Rhode Island Supreme Court in *Pickering v. American Employers Insurance Company Co.*,[37] an insurer cannot rely on any of the so-called "notice" provisions of the policy unless it can demonstrate that it has been prejudiced by the lack of notice.[38] In *Pickering*, the Rhode

---

35. 857 F.2d 945, 950–51 (4th Cir.1988).

36. *Id.* at 951.

37. 109 R.I. 143, 282 A.2d 584 (1971).

38. 109 R.I. at 159–60, 282 A.2d at 592–93 (1971). Liberty Mutual attempts to characterize *Pickering* as applying only to "technical breaches" where "the insurer receives adequate notice of the claim by some substantially similar means." Defendants Brief at 13, *citing Pickering*, 282 A.2d at 593. Defendant argues "the insurer is required to show prejudice only in instances where the breach is 'technical' and not

in a case where the insured makes no good faith effort to comply with the notice requirement." Defendants Brief at 13–14, *citing Stanko v. Hartford Accident and Indemnity Company*, 121 R.I. 331, 335, 397 A.2d 1325, 1327 (R.I.1979). Neither *Pickering* nor *Stanko* establish this limitation. In neither case did the Rhode Island court discuss the situation where the insurer was provided "adequate notice by some substantially similar means." Although the court did not formally require the insurer to show "prejudice" rule in *Stanko*, it was because the insured went so far as to settle the case with the responsible tortfeasor and thus "completely obliterate[ ] any

Island Court stressed the length of delay, the reasons for the delay, and the probable effect of the delay on an insurer in determining such prejudice.[39] The burden of showing prejudice is on the insurance carrier.[40]

Harden filed its complaint against Nortek on March 23, 1989. Nortek did not notify Liberty Mutual until almost one year later, February 2, 1990.[41] Liberty Mutual then waited until August 9, 1990 to deny coverage and a duty to defend.[42] Approximately two months later, on November 14, 1990, Liberty Mutual changed its position and acknowledged a limited duty to cover and a responsibility to defend. Liberty Mutual claims that it was "inherently prejudiced" by the late notice:

> [the law firms Nortek hired] were one year into the defense when notice was given to Liberty Mutual. Nortek then disregarded Liberty Mutual's reasonable attempt to control the defense pursuant to reasonable terms and 'ran the tab' to approximately 3 million dollars.

Even assuming, as Liberty Mutual argues, that the prejudice caused by Nortek's late notice was significant and that it raised the expenses of litigation, Nortek's default simply does not rise to the level of a "material breach" such that Liberty Mutual should be relieved of its duty to provide a defense.[43] Moreover, it is noteworthy that Liberty Mutual, by letter of August 9, 1990, initially disclaimed a duty to defend and disclaimed coverage, without mentioning the "late notice" defense.[44] Although Liberty Mutual has presented facts which might be relevant to the computation of damages or to Nortek's "failure to mitigate," it has not shown "prejudice" which negates Liberty Mutual's duty to pay for defense.

### 6. Damages

■ As discussed above, Liberty Mutual had an unequivocal duty to defend Nortek in the Harden litigation. This duty to defend extends to *all* claims asserted in the Harden Litigation, regardless whether some claims might not be covered under the contract.[45] After initially disclaiming coverage and refusing to defend Nortek, Liberty Mutual admitted both a limited duty to indemnify and a

hope [the insurer] might have had of seeking reimbursement from the [tortfeasor]." *Stanko,* 121 R.I. at 335, 397 A.2d at 1327.

**39.** *Pickering,* 109 R.I. at 159, 282 A.2d at 593.

**40.** *Id.*

**41.** Liberty Mutual acknowledged receipt of notification on March 28, 1990.

**42.** Neither in its letter of August 9, 1990, nor its letter of November 14, 1990 (admitting limited coverage and a duty to defend), did Liberty Mutual assert the defenses of "late notice" or absence of an "occurrence." Nortek argues that these defenses are therefore waived under the "mend the hold doctrine." Under the "mend the hold" doctrine, a party that bases its refusal to perform under a contract on certain stated grounds thereby waives all other potential bases for non:performance. *See Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 362–365 (7th Cir.1990). It is unnecessary to consider Nortek's argument on this point, however, since Liberty Mutual's defenses are invalid for other reasons, *see supra.*

**43.** *Cf. Pennsylvania General Insurance Co. v. Becton,* 475 A.2d 1032, 1035–36 (R.I.1984) (affirming trial court's finding that insurer was prejudiced because it was not able to have insured examined by a physician of its choice and to investigate her claim fully, when insured did not report claim until almost three years after the injury and more than two years after the injuries were treated); *Stanko,* 121 R.I. at 335–36, 397 A.2d at 1327 (R.I.1979) (excusing insurance company from formally demonstrating "prejudice" where insured settled claim with responsible tortfeasor prior to notifying insurer of claim).

**44.** *See* footnote 42 *supra,* discussing the "mend the hold" doctrine. Liberty Mutual has not shown that a review of the complaint at an earlier date would have yielded a different decision. Mr. Grubbs, Liberty Mutual's claims examiner, testified during his deposition that neither Liberty Mutual's process of reviewing claims in the Harden Complaint nor Liberty Mutual's determination of its obligations under the Policy would have been different had Nortek submitted the complaint to Liberty Mutual the day after it had been filed. *See Plaintiffs' Exhibit J at 135–36; Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1372 (D.N.J.1992) (insurance company's failure to diligently pursue a factual investigation after its receipt of untimely notice militates against a finding that it would have done so had timely notice been provided).

**45.** *See* footnote 19 *supra.*

limited duty to defend Nortek, and imposed limitations on attorneys fees and expenses. In view of this limited offer of defense, Nortek continued with defense counsel it had selected at the outset of the lawsuit and defended that action itself, at its own costs. Nortek now requests $2,410,164.96, which is the difference between the amounts it incurred in the Harden litigation ($2,824,356.57) and the amount which Liberty Mutual has already reimbursed ($414,191.61).

In a breach of contract action such as this one, Liberty Mutual is liable for such damages which may "fairly and reasonably" be considered as arising naturally from the course of the breach of the contract itself, or those damages arising from the breach which are "reasonably foreseeable" by the parties at the time they entered into the contract....[46] This rule is designed to "put the injured party as close as is reasonably possible to the position he would have been in had the contract been fully performed."[47] It would seem, then, that Liberty Mutual would be liable for attorneys' fees and costs as provided in the Policy or as "incurred in good faith, and in the exercise of a reasonable discretion" in defending the action.[48]

 On this issue, there clearly exists genuine issues of material fact as to the amount of "reasonable" attorneys fees incurred by Nortek. Liberty Mutual is responsible only for those fees and costs "incurred in good faith, and in the exercise of a reasonable discretion." Further, Nortek should be held personally responsible for any "additional" or "excessive" fees it caused by its own failure to comply with the notice provisions of the policy. Summary judgment should be denied as to the issue of damages.

*Conclusion*

Based on the above discussion, I find there are no genuine issues of material fact in this case except with regard to the amount of damages. I further find that Nortek is entitled to judgment as a matter of law on its breach of contract claim. Accordingly, I recommend that Nortek's motion for partial summary be granted on the breach of contract claim (except on the issue of damages) and that Liberty Mutual's cross-motion for summary judgment be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[49] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[50]

November 16, 1993

---

**46.** *George v. George F. Berkander, Inc.,* 92 R.I. 426, 430–31; 169 A.2d 370, 372–73 (1961).

**47.** *George,* 92 R.I. at 430; 169 A.2d at 372 (1961).

**48.** *See Zurich Insurance Co. v. Killer Music Inc.,* 998 F.2d 674, 680 (9th Cir.1993) (citing California Code § 2778).

**49.** Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

**50.** *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).